**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No.  14-cv-8400 |
| | ) |
| v. | ) |
| | ) |
| JDI DATING, LIMITED, a United Kingdom private limited company; and | ) |
| | ) |
| WILLIAM MARK THOMAS, individually and as an owner, officer, or director of JDI DATING, LIMITED, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.      The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, to obtain preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 4 of ROSCA, 15 U.S.C. § 8403, in connection with Defendants' marketing and sale of online dating services.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b) and 57b; and Section 5(a) of ROSCA, 15 U.S.C. § 8404(a).

1

3.      Venue is proper in this district under 28 U.S.C. §§ 1391(b)(2), (b)(3), (c)(2), and (c)(3), and 15 U.S.C. § 53(b).

## PLAINTIFF

4.      The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-8405, which prohibits certain methods of negative option marketing on the Internet.

5.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and ROSCA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, and 8404.

## DEFENDANTS

6.      Defendant JDI Dating, Limited ("JDI"), is a United Kingdom private limited company with its principal place of business at 3600 Solent Business Centre, 1st Floor, Whitely, Hampshire, United Kingdom PO15 7AN.  JDI transacts or has transacted business in this district and throughout the United States.

7.      Defendant William Mark Thomas ("Thomas") is an owner, officer, and director of Defendant JDI and its Chief Executive Officer.  At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Defendant JDI, including the acts and

2

practices set forth in this Complaint. Defendant Thomas, in connection with the matters alleged

herein, transacts or has transacted business in this district and throughout the United States.

## COMMERCE

8.      At all times material to this Complaint, Defendants have maintained a substantial

course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act,

15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

9.      Since at least 2013, Defendants have operated an online dating service comprised

of eighteen different Internet websites, including cupidswand.com, flirtcrowd.com, and

findmelove.com. Defendants also operate a company website at jdidating.com.

10.     The purpose of Defendants' online dating service websites is to provide a forum

where users of Defendants' service can contact and communicate with other like-minded people

over the Internet, typically for the express or implied purpose of developing personal, romantic,

or sexual relationships.

## Background

11.     Online dating service providers allow enrolled consumers access to databases of

other enrolled consumers for the purpose of finding potential romantic partners, typically based

on certain criteria, including such things as age, gender, sexual orientation, race, and location.

To facilitate finding a compatible person (or "match"), providers typically allow consumers to

interact with one another, often by utilizing Internet-based communications such as electronic

mail ("e-mail"), online (video or telephone) chat, and instant messages.

12.     To use an online dating service, providers typically require consumers to first

enroll and create a "profile." A consumer's profile will contain information about the consumer,

and within these profiles, consumers often are able to upload pictures and provide descriptive and personal information viewable by other users of the service.

13.     In many instances, whether a consumer will find a compatible match is largely dependent on the quality and quantity of profiles available on the service.  The more profiles a user has access to, and the more information contained within those profiles, the more likely that user is to find a compatible match.  Some providers may use objective criteria to facilitate finding a compatible match.  For example, some providers may filter profiles that do not match a user's expressed preferences, such as the profiles of other users not residing within specified geographic areas, or who are not of an expressed religious or sexual orientation.

14.     Providers typically charge consumers for access to and use of their online dating services.  In some instances, providers may give consumers free access to their online dating services.  In many of these instances, however, providers often will limit the amount of access that non-paying users have to that provider's services.  For example, providers may give limited-time free trials, or they may restrict the types of services non-paying users can access before payment is required.  Restricting a non-paying user's access to a provider's full range of online dating services often will serve to encourage those users to pay for a broader range of services.

### Defendants' Online Dating Services

15.     Defendants' online dating service websites typically feature several different pay-based membership plans ("subscriptions") that range from approximately $10 to $30 per month depending on the level of service chosen.  Consumers typically pay for Defendants' service by entering their credit card information into Defendants' website.

16.     The duration of Defendants' subscriptions range from one month to twelve months, and consumers typically can select from three or four different subscription durations.

4

For example, on one of Defendants' websites, consumers can select: (a) "12 Month Access: ~~was~~ ~~$12.95~~ Now Only $8.42/mo Charged $101.04 today for 12 Months;" (b) "6 Month Access: ~~was~~ ~~$17.95~~ Now Only $11.67/mo Charged $70.02 today for 6 Months;" (c) "3 Month Access: ~~was~~ ~~$24.94~~ Now Only $16.21/mo Charged $48.63 today for 3 Months;" or (d) "1 Month Access: ~~was~~ ~~$34.95~~ Now Only $22.72/mo Charged $22.72 Monthly."

17.     Nowhere on the website where consumers select a subscription do Defendants disclose that these subscriptions will be renewed automatically at the end of the chosen term, and that the consumer will incur further charges, unless the consumer takes affirmative steps to cancel their subscription or to prohibit recurring renewals.

18.     Defendants' websites also typically feature a "free" membership plan that allows consumers to set up a profile at no cost. Defendants refer to these non-paying users as "Members," and to paying users as "Subscribers."

19.     Consumers who select Defendants' free membership plan are allowed to set up a profile containing photographs and personal information. In numerous instances, once enrolled, non-paying Members can view the profiles of other users, but their ability to communicate with other users is restricted. For example, non-paying Members can send limited communications to other users known as "winks," "flirts," and "ice breakers," but they are unable to send personalized messages, view full-sized photographs, or read certain messages. Non-paying Members who attempt to execute these actions are redirected to Defendants' upgrade webpage where they are encouraged to enroll in a paid subscription to Defendants' online dating service.

20.     When enrolling in Defendants' service, consumers are required to provide an e-mail address. Defendants use this e-mail address to communicate with consumers regarding enrollment in Defendants' online dating service and to provide enrolled consumers with

notifications about activity directed to the consumer's profile. For example, consumers may receive an e-mail from Defendants when another user has viewed the consumer's profile, or sent the consumer a message, wink, or flirt.

21.     The terms and conditions for Defendants' service are not displayed on the websites when consumers enroll, and consumers are able to enroll in Defendants' service without reading or accessing Defendants' terms and conditions. The terms and conditions are viewable only if consumers separately click a "Terms & Conditions" hyperlink. Clicking on the "Terms & Conditions" hyperlink displays a separate webpage (the "terms and conditions page") containing multiple pages of densely worded black text. When viewing the terms and conditions page, consumers typically cannot read all of the terms and conditions without scrolling through the page.

22.     On Defendants' company website, as opposed to their various dating websites, JDI purports to have "over 12 million members across [its] 18 dating sites," suggesting that consumers are likely to find a compatible match. In reality, however, the number of active users of Defendants' websites is significantly lower because the vast majority of individuals included in the membership statistics are non-paying Members, many of whom have never used Defendants' service or have not used it for months or years.

**Defendants' Use of "Virtual Cupids" to Communicate With Users**

23.     Once consumers have enrolled in Defendants' online dating service, their profiles are viewable and accessible by other users of the service. Almost immediately after completing the enrollment process, users begin to receive e-mails from Defendants notifying them that they have received communications from other users. For example, within minutes of enrolling, users typically receive an e-mail notification indicating that another user has sent a "wink."

24.     In the next few days, users typically are notified that they have received several additional communications that purport to be from other users, such as additional "winks," written messages, requests for photos, or notices that another user has added the consumer to his or her "favorites" list.  Consumers are led to believe that other users in the same geographic area have initiated these communications.  Frequently, non-paying Members are unable to either read or reply to many of these communications without first becoming a paid Subscriber.

25.     In many instances, the communications consumers receive are not from actual users of Defendants' online dating service, but rather are from "Virtual Cupids"—that is, fake users set up by Defendants who communicate with consumers in the same way that actual users would.  The profiles of these Virtual Cupids frequently contain photographs and personal information mimicking real people, and the Virtual Cupids often appear to reside in the same geographic area as the consumer.  The communications from Defendants' Virtual Cupids are computer generated and are sent at specific intervals measured from the consumer's date of enrollment.

26.     To users of Defendants' service, the communications generated by Virtual Cupids are virtually indistinguishable from communications generated by actual users.  The e-mail notifications consumers receive do not indicate that the communications are from one of Defendants' Virtual Cupids.

27.     The only indication that a particular user is actually a Virtual Cupid, moreover, is on the profile page, where a Virtual Cupid's profile will include a small, monochromatic symbol representing a "v" encircled by a larger "C" (the "VC logo").  Some communications may also include the VC logo, but in many instances, consumers cannot read or view the communications without first upgrading to a paid subscription.

28.     Even consumers who locate the VC logo are unlikely to attach any significance to it.  Defendants do not provide an explanation of the VC logo except on their terms and conditions page.  Even there, Defendants do not display the actual VC logo used to distinguish the communications of Virtual Cupids from those of actual users.

29.     As a result of Defendants' use of Virtual Cupids, numerous non-paying Members have been induced to upgrade to paid subscriptions so that they can read and respond to the communications they are receiving.

**Renewal and Cancellation of Consumers' Subscription Plans**

30.     Consumers who pay to subscribe to Defendants' service are automatically renewed on the expiration date of the subscription they have chosen, generally for the same time period as the initial subscription.  To avoid this automatic renewal and further charges to their credit cards, consumers must affirmatively cancel the subscription at least 48 hours prior to the end of the subscription period.  The automatic renewal of users' subscriptions is a form of negative option marketing.

31.     Defendants do not clearly and conspicuously disclose this automatic renewal feature before obtaining users' billing information.  The fact that a user's subscription will be automatically renewed at the end of the chosen subscription period is disclosed only on the terms and conditions page, which can only be accessed by clicking on a hyperlink.  Even if a consumer clicks on this hyperlink, Defendants' policy of automatically renewing users is buried within pages of densely worded text.

32.     Defendants fail to obtain the express informed consent of consumers to the terms of the automatic renewal feature before obtaining users' billing information.  Although consumers must "certify" that they agree to Defendants' terms and conditions when enrolling,

8

they are not required to access or read the terms and conditions, which are available only by
clicking on a hyperlink on Defendants' websites.

33.     Defendants also do not provide users with a simple mechanism to stop the
otherwise recurring charges.  In numerous instances, consumers have had difficulty canceling
their subscriptions with Defendants.  Defendants often respond to consumers' cancellation
requests by sending additional e-mails to those consumers that request information about why
the consumer is canceling, or that offer to extend the service at no additional charge.  In such
instances, Defendants do not honor consumers' cancellation requests unless consumers
separately respond to Defendants' e-mails and renew their request to cancel.  In some instances,
despite informing consumers that their account has been canceled, Defendants have rebilled
consumers for the service.

## VIOLATIONS OF THE FTC ACT

34.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts
or practices in or affecting commerce."

35.     Misrepresentations or deceptive omissions of material fact constitute deceptive
acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I
### Misrepresentation Regarding Users of Defendants' Service

36.     In numerous instances in connection with the advertising, marketing, promotion,
offering for sale, or sale of their online dating service, Defendants have represented, directly or
indirectly, expressly or by implication, that communications received by users of Defendants'
service are from actual people interested in communicating with those users.

37.     In truth and in fact, in numerous instances in which Defendants have made the
representation set forth in Paragraph 36 of this Complaint, the communications received by users

of Defendants' service are not from actual people interested in communicating with those users, but instead are from computer generated virtual profiles created by Defendants.

38.     Therefore, Defendants' representation as set forth in Paragraph 36 of this Complaint is false and misleading and constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### Failure to Adequately Disclose Automatic Renewal Terms

39.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of their online dating service, Defendants have represented, directly or indirectly, expressly or by implication, that consumers who enter their billing information into Defendants' websites are purchasing a one-time paid subscription to Defendants' online dating service.

40.     In numerous instances in which Defendants have made the representation set forth in Paragraph 39 of this Complaint, Defendants have failed to disclose, or disclose adequately, to consumers the material terms and conditions of the offer, including:

    a.     That Defendants actually are enrolling consumers in a negative option plan under which Defendants will continue to charge them;

    b.     That consumers must affirmatively cancel the negative option plan at least 48 hours before the end of their subscription period to avoid additional charges; and

    c.     The means consumers must use to cancel the negative option plan to avoid additional charges.

41.      Defendants' failure to disclose or disclose adequately the material information described in Paragraph 40 above, in light of the representation described in Paragraph 39 above,

constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

42.     In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  Section 2 of ROSCA, 15 U.S.C. § 8401.

43.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(u), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges.  *See* 15 U.S.C. § 8403.

44.     The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(u).

45.     As described in Paragraphs 9 to 33 above, Defendants have advertised and sold Defendants' online dating service to consumers through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(u).

11

46.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

## COUNT III
### Illegal Negative Option Marketing

47.     In numerous instances, in connection with the automatic renewal of their online dating service subscriptions, Defendants have failed to:

a.     provide text that clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information;

b.     obtain a consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for products or services through such transaction; and/or

c.     provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

48.     Defendants' acts or practices, as described in Paragraph 47 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

49.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and ROSCA.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices.  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

50.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

51.     Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404, authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

52.     Wherefore, Plaintiff FTC, pursuant to Section 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, Section 5 of ROSCA, 15 U.S.C.  § 8404, and the Court's own equitable powers, requests that the Court:

A.     Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA by Defendants;

B.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and ROSCA, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

C.     Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully submitted,

JONATHAN E. NEUCHTERLEIN
General Counsel

Dated: October 27, 2014

/s/ Steven Wernikoff
STEVEN M. WERNIKOFF
WILLIAM J. HODOR
Federal Trade Commission
Midwest Region
55 West Monroe Street, Suite 1825
Chicago, Illinois 60603
(312) 960-5634 [telephone]
(312) 960-5600 [facsimile]
swernikoff@ftc.gov [e-mail, Wernikoff]
whodor@ftc.gov [e-mail, Hodor]

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION